UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUAN VERDUZCO, aka JAIME
VERDUZCO,

                Petitioner,

  vs.

DOMINGO URIBE, JR., Acting Warden,

                Respondent.

_____/

No. C 09-5894 JH (PR)

**ORDER DENYING PETITION
FOR WRIT OF HABEAS
CORPUS AND DENYING
CERTIFICATE OF
APPEALABILITY**

     This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. §
2254.  The court ordered respondent to show cause why the writ should not be granted.
Respondent has filed an answer and a memorandum of points and authorities in support of
it, and has lodged exhibits with the court.  Petitioner has responded with a traverse.  For
the reasons set out below, the petition is denied.

**BACKGROUND**

     An Alameda County jury found petitioner, Juan Verduzco, guilty of first degree
murder, Cal. Penal Code § 187, by means of a firearm causing great bodily injury, Cal.
Penal Code § 12022.5(a)(1), possession of a firearm by a convicted felon, Cal. Penal Code
§ 12021(a)(1), and possession of methamphetamine, Cal. Health & Saf. Code § 11377. Ex.
1 at 210-213.  The court sentenced petitioner to fifty-five years and eight months to life in
state prison.  Ex. 1 at 219.  The California Court of Appeal affirmed the judgment and
denied petitioner's habeas corpus petition on May 27, 2008.  Ex. 6.  The California
Supreme Court denied review on September 17, 2008.  Ex. 8.

     The following facts are excerpted from the opinion of the California Court of Appeal:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

Verduzco's crime took place in front of "the Glass House," a place where various participants in the trial used to go to smoke methamphetamine. David Gonzalez drove his friend, Jose Uribe to the Glass House.  Gonzalez sat in his van while Uribe talked with his girlfriend, Ruby Cardenas, on the front steps of the house.  As Uribe was walking back to Gonzalez's van, Verduzco drove up with some other passengers.  Uribe greeted one of the passengers in Verduzco's car and Verduzco answered.FN1 Uribe told Verduzco, "Shut up. I'm not talking to you."  Verduzco told Uribe that he did not want to talk to him either.  Uribe, who was quick-tempered, replied "Oh, motherfucker," and Verduzco told him to calm down.  But Uribe persisted. Uribe was unarmed and never threatened Verduzco.  He just seemed to want to fight with him, and was coaxing Verduzco out of the car saying "Get out, you motherfucker."  Uribe was yelling at Verduzco, but Verduzco was not yelling back.  He was "just telling [Uribe] to calm down."  Verduzco did not appear frightened by Uribe and Verduzco got out and stood at the driver's side door of the car.  Verduzco told Uribe again to calm down and retrieved a shiny object from the door of his car.  He took three or four steps toward Uribe as Uribe backed up and turned around.  Uribe called Verduzco by his nickname and said, "Oh, no, Yoko. No. Oh, no."  Gonzalez saw that Verduzco was aiming a gun at Uribe's chest and he heard a couple of shots.  Gonzalez crouched down in his van and heard Uribe say, "Tell him not to shoot anymore."  Then Gonzalez heard four or five more shots.  When the shooting stopped Gonzalez saw Verduzco drive off.  Uribe was lying on the ground. He died from his wounds.

FN1. When Gonzalez spoke to police several months later, he said Uribe told one of the passengers who arrived with Verduzco to watch out for Verduzco because he was a troublemaker.

Gonzalez was very frightened and drove away.  He did not call the police that night because he "didn't have quarters" and he was afraid.  When Gonzalez was contacted by police about three months after the shooting, he identified Verduzco as the shooter.

The evening Uribe was killed, Officer Gerardo Melero interviewed Cardenas at the scene.  She was crying and upset.  Cardenas initially said she was scared and did not want to provide a statement.  Then she claimed that an unknown "Hispanic guy" shot Uribe and drove away.  Officer Melero drove Cardenas to the home of her aunt who instructed Cardenas to cooperate with police.  Cardenas told Melero, "It was Yoko who shot Tito." FN2  Cardenas knew Verduzco well.  He had stayed at her house and she had seen him more than 50 times.  Uribe previously told Cardenas that he was having some unspecified problems with Verduzco.  When she spoke with Officer Melero, Cardenas did not appear to be under the influence of methamphetamine.

FN2. Uribe was also known as Tito.

Octavio Ornelas was also at the Glass House when Uribe was killed. Ornelas and Uribe met in jail about two months earlier and Ornelas considered Uribe his friend.  Ornelas also told police he knew Verduzco and had seen him several times before the killing.FN3

FN3. Ornelas was unavailable to testify at trial because he had been deported.  His statements to police and his preliminary hearing testimony

1    were read into the record.

2        In a tape-recorded interview played for the jury, Ornelas said he saw
Uribe running and Verduzco chasing him while holding a gun.  Uribe was
3    unarmed and was shot in the back.  After he heard several shots, Ornelas
approached Uribe and knelt down by his side.  Verduzco almost immediately
4    drove away.

5        In his written statement provided at the scene, Ornelas said a "male
hispanic" drove up and started "motherfucking [Uribe]."  As he was yelling at
6    Uribe," the guy pulled a gray gun out of his pants and shot [Uribe] about three
times."  Ornelas described the shooter and said he thought he could identify
7    him.  Ornelas was an extremely reluctant witness, and at the preliminary
hearing claimed he did not see the murder because at the time of the murder
8    he had gone to a nearby store to buy beer.  He disclaimed his previous
statements to police that identified Verduzco as Uribe's killer, and said that he
9    maybe "lied" because he was "desperate" and "on drugs," or wanted to help
Uribe.  "Everything was a blur" and Ornelas had little memory of reviewing
10   approximately 100 photographs with police and identifying Verduzco as
Uribe's killer.  The deputy district attorney who questioned Ornelas in the
11   preliminary hearing testified that he was "extremely upset" that day and she
had never seen a witness "that anxious to not be on the witness stand . . . ."
12
         Following the preliminary hearing, Verduzco was charged by
13   information with murder by means of a firearm causing great bodily injury,
possession of a firearm by a convicted felon, and possession of
14   methamphetamine for sale.  An "on bail" enhancement was charged on the
drug possession count, and before trial, Verduzco admitted that he was on
15   bail when he was arrested for the drug offense.

16       Cardenas was a reluctant witness at trial who claimed she was inside
the house when Uribe was killed.  She denied that she told police she saw a
17   "Hispanic guy" shoot Uribe and could not remember identifying Verduzco as
the shooter.  She said she did not "remember anything" because she had
18   taken methamphetamine before she gave her statement to police.  Her taped
statement to police was played to the jury and they were given a transcript of
19   it.  In her statement, Cardenas said Uribe was unarmed and Verduzco shot
him in the back, got in his car and drove away.  Gonzalez also testified about
20   what he saw when Uribe was shot.

21       Lorraine Gomez lived at the Glass House when Uribe was killed and
she testified he was her friend.  Gomez also knew Verduzco from his previous
22   visits to the Glass House.  Gomez was in her room when she heard multiple
gunshots, one after the other.  When she went outside Uribe was on the
23   ground. Gomez saw Verduzco holding a gun.  She saw him "put his hand
down, jump in a car, and he took off smashing [leaving very fast]."  No one
24   else had a gun.  When Gomez was interviewed by police on the night of the
shooting, she identified a photograph of Verduzco as the shooter.  She also
25   told police about an argument between Verduzco and Uribe about a month
before the shooting.  They "started doing some stupid kick things to each
26   other. Kicking each other's windows, car windows . . . .  They was trying to
prove who was better than who."  Gomez testified she heard about the
27   argument from others, but did not witness it herself.

28       Guadalupe Benitez Manzo was also in the Glass House when she

3

heard gunshots.  She came out of the house and saw Cardenas crying hysterically over Uribe and Verduzco get in his car and quickly drive away. Manzo was initially reluctant to provide information to the police.  After she learned that others had identified Verduzco as the shooter, she told police it was he who drove away after Uribe was shot.

Uribe's body had six bullet wounds.  There were two entrance wounds in his chest and four entrance wounds in his back.  Six .38-caliber casings fired from a single gun were recovered at the scene. T he crime lab witness implied they were from a semi-automatic pistol, which would require the shooter to pull the trigger once for each shot.

The parties stipulated that police recovered methamphetamine from a residence searched by officers just after Verduzco was arrested for murder. Officers conducting surveillance saw Verduzco accompanied by a woman and child emerge from a house that had a rear unit.  They confirmed that Verduzco lived in the back and Verduzco's keys fit the door of the unit.  The drugs were found on top of an open file drawer in the bedroom.  The room also contained men's clothing in what appeared to be Verduzco's size, women's clothing, and a child's clothing, as well as a live round of 9-millimeter ammunition.

The parties also stipulated Verduzco was previously convicted of a felony for purposes of the charge that he was a felon in possession of a firearm.  Verduzco presented no witnesses.

The jury deliberated for two hours before reaching its verdicts.  The jury convicted Verduzco of first degree murder by means of a firearm causing great bodily injury, possession of a firearm by a convicted felon, and possession of methamphetamine.  Verduzco was found not guilty of possession of methamphetamine for sale.  Verduzco was consecutively sentenced to 25 years to life for the murder, 25 years to life for discharge of a firearm, 3 years for possession of methamphetamine, 8 months for possession of a firearm by a convicted felon, and 2 years for the "on bail" enhancement.  His total term is 55 years, 8 months to life.  He timely appealed

Ex. 6 at 1-5.[1]

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

[1]Citations to "Ex." are to the record lodged with the court by the Attorney General.

United States District Court
For the Northern District of California

1   proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

2   mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, (2000),

3   while the second prong applies to decisions based on factual determinations, *Miller–El v.*

4   *Cockrell*, 537 U.S. 322, 340 (2003).

5       A state court decision is "contrary to" Supreme Court authority, that is, falls under

6   the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

7   that reached by [the Supreme] Court on a question of law or if the state court decides a

8   case differently than [the Supreme] Court has on a set of materially indistinguishable facts."

9   *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application

10  of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

11  identifies the governing legal principle from the Supreme Court's decisions but

12  "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The

13  federal court on habeas review may not issue the writ "simply because that court concludes

14  in its independent judgment that the relevant state-court decision applied clearly

15  established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must

16  be "objectively unreasonable" to support granting the writ. *Id.* at 409.

17      A state court's determination that a claim lacks merit precludes federal habeas relief

18  so long as "fairminded jurists could disagree" on the correctness of the state court's

19  decision. *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (citing *Yarborough v.*

20  *Alvarado*, 541 U.S. 652, 664 (2004)).  "As a condition for obtaining habeas corpus [relief]

21  from a federal court, a state prisoner must show that the state court's ruling on the claim

22  being presented in federal court was so lacking in justification that there was an error well

23  understood and comprehended in existing law beyond any possibility for fairminded

24  disagreement." *Id.* at 786.  Review under § 2254(d)(1) is limited to the record that was

25  before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 131 S.

26  Ct. 1388, 1398 (2011).

27      Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

28  determination will not be overturned on factual grounds unless objectively unreasonable in

United States District Court
For the Northern District of California

5

**United States District Court**
For the Northern District of California

1  light of the evidence presented in the state-court proceeding."  *Miller–El*, 537 U.S. at 340.

2       When there is no reasoned opinion from the highest state court to consider the

3  petitioner's claims, the federal court looks to the last reasoned opinion.  *See Ylst v.*

4  *Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079

5  n.2 (9th Cir. 2000).  In the present case, the California Court of Appeal was the last court to

6  issue a reasoned decision addressing petitioner's claims.

7                                    **DISCUSSION**

8       As grounds for federal habeas relief, petitioner raises claims of prosecutorial

9  misconduct, instructional error, insufficiency of the evidence and ineffective assistance of

10  trial counsel.

11  **I.    Prosecutorial Misconduct**

12       Petitioner claims prosecutorial misconduct based on the prosecutor's conduct

13  concerning witnesses and alleged inflammatory comments regarding petitioner.

14       **A.    Standard**

15        A claim of prosecutorial misconduct is cognizable in federal habeas corpus.  "[T]he

16  appropriate standard of review for such a claim on writ of habeas corpus is the narrow one

17  of due process, and not the broad exercise of supervisory power."  *Darden v. Wainwright*,

18  477 U.S. 168, 181 (1986) (quotation and citation omitted).  A defendant's due process

19  rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."

20  *Id.*; *see Smith v. Phillips*, 455 U.S. 209, 219 (1982) (noting, "the touchstone of due process

21  analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

22  culpability of the prosecutor").  Under *Darden*, the first consideration is whether the

23  prosecutor's remarks were improper; if so, the next question is whether such conduct

24  infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  A

25  prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings

26  to determine whether the prosecutor's remarks so infected the trial with unfairness as to

27  make the resulting conviction a denial of due process."  *Johnson v. Sublett*, 63 F.3d 926,

28  929 (9th Cir. 1995) (quotation and citation omitted).

**B.     Conduct Concerning Witnesses**

Petitioner contends the prosecutor committed misconduct in her examination of certain witnesses and by arguing to the jury that those witnesses were afraid to testify against him and were intimidated by his mere presence in the courtroom.  He argues this alleged misconduct violated his rights  to due process, to be present at trial and to confront witnesses against him.

**1.     Background**

Petitioner's claim is based on the following statements made by the prosecutor and elicited from witnesses during trial.

a.     Opening Statement

In her opening statement, the prosecutor discussed the testimony of Octavio Ornelas, a witness to the murder who would not be present at the trial.  She told the jury:

> What you're going to learn is there was a prior hearing in this case.  It was just a hearing before a judge.  And Octavio Ornelas testified at that hearing and he lied on the stand.  This is something we talked about in voir dire.  He said that he did not remember what happened.  He said that he wasn't there; he was at the store. [¶] And he is also not going to be here in this trial.  But you're going to hear his testimony from the prior hearing.  And you're going to hear from the district attorney who was at that prior hearing.  And . . . she's going to tell you his demeanor at that prior hearing and she's going to tell you that he was testifying in front of the defendant.  Sitting in the same room with him.  [¶]  And you will hear his taped statement that he gave to the police right after it happened.

1 RT 96:11-28.

After identifying other witnesses who were expected to testify, she said:

> These are some of the witnesses you will hear from in this case.  I do not know what they will say on that witness stand.  I do know that they're scared.  I do know that none of them want to be here. They may change their story and try to pretend like they weren't there.  They may try to tell you a different story than what they told police.  Or they may have the courage to tell the truth.  I don't know.

1 RT 97:26-98:6.

b.     Examination of Witnesses

At trial, one of the witnesses called by the prosecution was Jill Klinge, the prosecutor who presented the case against petitioner at the preliminary hearing.  Klinge testified that

United States District Court

For the Northern District of California

1    she first met with Ornelas before the preliminary hearing when he was in custody in

2    Oakland on unrelated charges.  She testified that when she gave him the subpoena

3    directing him to appear at the preliminary hearing "[h]e was nervous and somewhat upset.

4    He did not want to keep the subpoena or take it, because he did not want it in his property

5    at jail because he didn't want anybody to know that he might testify against someone."  3

6    RT 544:19-22.  Klinge met with Ornelas again a few days later, when he was at the county

7    jail.  She testified that "[h]e was nervous.  He did not want to testify."  3 RT 545:21-22.

8    When she met with him a third time, his demeanor "was more agitated and more nervous

9    because the preliminary hearing was . . . set for the next day . . . ."  3 RT 546:18-19.

10   After the hearing was postponed, Klinge met with Ornelas a fourth and final time a day

11   before the rescheduled hearing.  She testified that at that meeting his demeanor was

12   "desperate and very agitated, very upset.  He absolutely did not  want to have to testify."  3

13   RT 547:10-12.  Klinge further testified that during the meeting Ornelas contradicted prior

14   statements he gave to police and, for the first time,  told Klinge that he did not witness the

15   shooting because he had gone to the store.  3 RT 548:23-549:17.  When asked to describe

16   Ornelas's demeanor on the day of the preliminary hearing, Klinge said: "He was extremely

17   agitated, extremely upset.  I have never seen a witness that anxious to not be on the

18   witness stand, to not testify."  3 RT 550:1-3.

19          The prosecutor also asked Uribe's girlfriend, Ruby Cardenas, how she felt about

20   testifying, and she responded, "I don't want to be here."  1 RT 189:5-7.  When she was

21   asked "Why not?" Cardenas responded, "I don't know."  1 RT 189:8-13.  The prosecutor

22   confirmed with Cardenas that they had just taken a five minute break and that she began to

23   cry while she and petitioner were sitting in the courtroom during the break.  When asked

24   why she was crying, Cardenas again said she did not know.  1 RT 189:14-25.

25          When Cardenas was interviewed by the police, she told them that she saw a

26   "Hispanic guy" shoot Uribe, and later identified the shooter as petitioner.  At trial, however,

27   she testified that she had gone into the house before he was shot and was not out front on

28   the sidewalk at the time.  She denied seeing petitioner that night and did not remember

1   giving her taped statement to police or otherwise identifying petitioner as the shooter, and

2   testified, "I was on meth. I don't remember anything."   2 RT 238:25.  The day before she

3   testified, the prosecutor offered to allow Cardenas to review her taped statement to police

4   to help her remember what had happened.  Cardenas declined the offer because she "just

5   wanted to leave everything in the past and [did not] want to remember anything."  2 RT

6   232:11-12.  When the prosecutor offered to play the tape for her, Cardenas refused

7   "[b]ecause I don't remember anything and that's it."  2 RT 232:22-23.

8         Witness David Gonzalez testified about events that occurred when he was waiting

9   outside the courtroom to testify in the trial.  Guadalupe Benitez Manzo passed by and told

10  him she was "going to be watching [him there] or what [he] was saying or that she would

11  see [him] on the street."  2 RT 389:28-390:1.  When Gonzalez was asked what Manzo's

12  words meant to him, Gonzalez said, "Like a threat, right?"  2 RT 390:3.  Gonzalez also saw

13  Manzo at the prosecutor's office earlier that day when Gonzalez was discussing his

14  anticipated testimony with the prosecutor.  Gonzalez testified he was not completely truthful

15  with the prosecutor "because she was there."  2 RT 391:2.  Manzo also told Gonzalez that

16  Verduzco had talked to someone in jail, but Gonzalez did not know who and did not know

17  what she meant by it.  2 RT 391:11-13.

18        When asked by the prosecutor if he was comfortable with testifying in the trial,

19  Gonzalez answered: "Well, yes. But two people have asked me questions about this.  And,

20  you know, and I've been threatened too. That's why I didn't explain everything really well to

21  her. There were other girls who said that there were other weapons, like they were also

22  blaming me."  2 RT 392:10-14.  When the prosecutor sought to have Gonzalez repeat that

23  he had been threatened, Gonzalez responded: "No, not that I - not that I've been

24  threatened, but I'm afraid that something could happen to me.  Nobody's threatened me."  2

25  RT 392:26-28.  Gonzalez said "people [had] spoken to [him]" and he had been asked

26  "things about this case."  2 RT 392:7-9.  Gonzalez directed those people to the police, and

27  said he would testify truthfully.  2 RT 392:9-10.

28  //

United States District Court
For the Northern District of California

1

c.      Closing Argument

2        In the opening part of her summation to the jury, the prosecutor discussed the

3   preliminary hearing testimony of Octavio Ornelas:

4                Now, you heard from Jill Klinge, the District Attorney that did the
            preliminary hearing.  You heard his state of mind leading up to the preliminary
5           hearing.  He was scared to testify in front of the defendant.[2]  Remember that
            hearing was just like this, the defendant watched him testify.
6
                Jill Klinge told you he could barely look at the defendant when he was
7           asked to identify him in court.

8                He changed his story numerous times.  Jill Klinge told you that she
            went out to talk to him numerous times.  And it wasn't until the day before he
9           was actually going to testify that all of a sudden he changed his story and
            said, "oh, I was at the store."
10
    4 RT 643:19-23.
11
12       The prosecutor also discussed the differences between Ruby Cardenas's statement

13   to the police on the night Uribe was shot and her trial testimony, saying:

14               She was very scared when she testified.  And if you remember, right
            when she testified, we had to take a five-minute break.  And I asked her when
15          we came back if she sat on that stand the entire five minutes while the
            defendant was in the room.  And she said yes.  She sat there for five minutes
16          with the defendant in the same room.   And that's how she began her
            testimony. [¶]  She was scared, and she was shaking.  Therefore she claimed
17          that she didn't remember.

18   4 RT 640:3-11.

19       In the closing part of her summation the prosecutor responded to defense counsel's

20   argument that all the witnesses were lying.  She acknowledged that Cardenas lied on the

21   stand, and reminded the jury that during voir dire she talked to them about domestic

22   violence victims who report abuse to the police but later get scared and lie in court.  She

23   asked the jurors not to abandon their responsibility to consider each witness individually,

24   but to look at each story and "determine, based on all the evidence, which version was

25   true."  4 RT 682:18-683:4.

26       She continued, saying:

27               There is a common theme of why these witnesses lied.  I call it the fear factor.

28   _____

[2]Klinge's testimony to this effect was stricken.  3 RT 545:27.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   And you actually heard the police officers talk about this. It is very common in
2   Oakland. [¶] . . . [Officer Melero] removed [Cardenas] from the scene, because
    they find, in their experience, people are more likely to talk. They don't ever want to
    talk to the police, no one ever wants to be a witness to a murder. And no one ever
3   wants to come into a courtroom and sit in front of the accused and point to him.

4   4 RT 684:12-26.

5        The prosecutor further said that even Cardenas's friends did not want to talk to the

6   police "because everyone knows about the fear factor. Everyone knows what could

7   happen if you point the finger at someone." 4 RT 685:19-21. Cardenas "said she didn't

8   want to testify. It was clear that she was scared. She has three kids. She's looking out for

9   herself and her family. She was scared to look at the defendant when she had to identify

10  him in court." 4 RT 686:5-9.

11       Regarding Octavio Ornelas, the prosecutor said:

12          Octavio also had the fear factor. He told the district attorney Jill Klinge
            that he didn't want to testify because he was scared. He said that he didn't
13          want his subpoena because he was in jail. And he didn't want other people to
            know that he was involved. He was worried what would happen to him if he
14          were going to be a witness in a murder case. He told Jill Klinge he wanted
            the whole thing to go away. He said he did not want the defendant to have
15          his statements. He was worried about that.

16          The day he testified, Jill Klinge said it was like his head was going to
            explode. He was agitated, upset, and desperate. And you heard through the
17          reader, he would say anything except the truth. Because the defendant was
            sitting there and he didn't want the defendant to know it was him that pointed
18          the finger.

19  4 RT 686:25-687:12.

20       The prosecutor also argued that David Gonzalez had a fear factor because he had

21  been threatened. 4 RT 686:10-20.

22       **2.    The State Court's Ruling**

23       The Court of Appeal rejected petitioner's claim that the prosecutor violated his right

24  to due process by suggesting that he had threatened or caused a third party to threaten the

25  witnesses. After explaining that a witness's fear of retaliation is relevant to credibility even

26  if there is no evidence of threats by the defendant, the Court of Appeal found as follows:

27          It is generally proper for the prosecution to introduce evidence and
            comment upon a witness's fear of testifying. "Evidence that a witness is
28          afraid to testify or fears retaliation for testifying is relevant to the credibility of

11

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7

that witness and is therefore admissible.  [Citations.]  An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court." [*People v. Guerra,]* Cal.4th 1067, 1141; *see also* Evid. Code § 780, subd. (f).)  "For such evidence to be admissible, there is no requirement to show threats against the witness were made by the defendant personally or the witness's fear of retaliation is 'directly linked' to the defendant." (*Guerra*, supra, at p. 1142.)  "It is not necessarily the source of the threat - but its existence - that is relevant to the witness's credibility." *([People v. Burgener,* (2003) 29 Cal.4th 833] supra*, at pp. 869-870; *see also People v. Navarette, supra,* 30 Cal.4th at p. 507 [prosecutor "had a right to inquire into matters relating to the  witness's credibility . . . [and] appropriately elicited evidence that defendant's girlfriend, who had been sitting in the courtroom, made the witness afraid"].)

8
9
10
11
12
13
14
15
16

. . . [T]he evidence in question here was relevant to explain inconsistences between Cardenas's and Ornelas's courtroom testimony and their earlier statements to the police.  Similarly, the testimony that Gonzalez and Manzo were fearful or reluctant bore upon their credibility to explain their delay or initial unwillingness to identify Verduzco as the killer.  (*See People v. Guerra*, supra, 37 Cal.4th at pp. 1140-1141.)  The defense argued that all of them were lying. The jury was entitled to consider this testimony in evaluating the credibility of these witnesses, and the prosecutor did not commit misconduct in commenting on their fearfulness or apprehension in her argument. (*Id.* at p. 1153 ["Each party is entitled to comment fairly on the evidence and the reasonable inferences that can be drawn from the evidence"]; *see also People v. Gutierrez* (1994) 23 Cal.App.4th 1576, 1588 [when witnesses who gave statements to police and identified the defendant as the shooter were reluctant to testify, "the jury was entitled to learn of possible reasons for the witnesses' radically different versions of what they saw or did not see that [day] in order to accurately assess their credibility at trial"].)

17   Ex. 6 at 11-12.

18   The Court of Appeal also rejected petitioner's contention that the prosecutor's

19   insinuation that petitioner's mere presence in the courtroom with the witnesses had an

20   intimidating effect on them violated his rights to be present at the trial and confront

21   witnesses against him:

22
23
24
25
26
27
28

We conclude the record does not support Verduzco's argument.  (*See People v. Benson* (1990) 52 Cal.3d 754, 793 [reviewing court must determine how reasonable juror would understand prosecutor's remarks].)  First of all, the prosecutor made no direct statement about Verduzco's right to be present at trial.  Much of the evidence and argument challenged by Verduzco can more reasonably be interpreted to suggest that the witnesses were motivated by a general reluctance to cooperate with the police and prosecution, a phenomenon that Verduzco acknowledges is "well known in the criminal courts."  The cases Verduzco relies upon to support this argument generally hold that a defendant has a right to be represented and confront witnesses at critical stages of the proceedings.  None of them concludes that a prosecutor violates a defendant's constitutional rights because she states that a witness may testify differently in front of the defendant than when speaking privately

1    to the police, and we will not so conclude in this case.

2    Ex. 6 at 15.

3        The Court of Appeal concluded, "There is no record in this case of prosecutorial

4    conduct that we would categorize as 'egregious,' 'deceptive or reprehensible' such as to

5    warrant our conclusion that Verduzco's trial was so unfair he was denied due process."  Ex.

6    6 at 16 (citation omitted).

7                    **3.    Analysis**

8        Habeas relief is warranted only if the prosecutor's comments "so infected the trial

9    with unfairness as to make the resulting conviction a denial of due process."  *Darden,* 477

10   U.S. at 181 (citation omitted).  Because the standard of review on federal habeas corpus is

11   "the narrow one of due process, and not the broad exercise of supervisory power," even

12   improper argument does not necessarily violate a defendant's constitutional rights.

13   *Thompson v. Borg,* 74 F.3d 1571, 1576 (9th Cir. 1996) (citation omitted); *Duckett v.*

14   *Godinez,* 67 F.3d 734, 743 (9th Cir. 1995).

15       Under California law, a witness's fear of retribution for testifying is relevant to

16   establish the witness's credibility.  *See People v. Olguin,* 31 Cal. App. 4th 1355, 1368

17   (1994)  ("A witness who testified despite fear of recrimination of any kind by anyone is more

18   credible because of his or her personal stake in the testimony.")  Here, the prosecutor's

19   comments about some of the witnesses' fear of testifying offered an explanation for their

20   inconsistent statements and/or delay in identifying petitioner as the killer.  The conclusion

21   that the witnesses were fearful was a fair inference that could be drawn from the evidence,

22   and one the jury could assess for itself from its own observation of their testimony.  Further,

23   no accusation was made that petitioner had threatened anyone, directly or indirectly.

24   Moreover, the jury was instructed that statements made by counsel are not evidence, Ex. 1

25   at 147, and this court must assume the jury followed these instructions where, as here, no

26   evidence has been presented to the contrary.  *Henderson v. Kibbe*, 431 U.S. 145, 154-155

27   (1977).

28       The state court also did not contravene Supreme Court precedent by rejecting

United States District Court

For the Northern District of California

1   petitioner's claim that the prosecution violated his rights to be present at trial and confront

2   witnesses against him.  The California Court of Appeal's finding that the prosecutor made

3   no direct statement about petitioner's right to be present at trial was not objectively

4   unreasonable.  Additionally, the court observed that petitioner had pointed to no Supreme

5   Court authority finding a constitutional violation based on a prosecutor's comments that a

6   witness testified differently in the defendant's presence than when speaking privately to the

7   police.  Nor does petitioner do so here, and this Court is aware of none.  Federal habeas

8   corpus relief may be granted on a claim that was adjudicated in state court only if the state

9   court's determination "resulted in a decision that was contrary to, or involved an

10  unreasonable application of, clearly established Federal law, as determined by the

11  Supreme Court of the United States . . . ."  28 U.S.C. § 2254(d)(1).  If there is no United

12  States Supreme Court precedent that controls on the legal issue raised by a petitioner in

13  state court, the state court's decision cannot be contrary to, or an unreasonable application

14  of, clearly established federal law.  *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

15      Based on the above, this court finds the state court's determination was not contrary

16  to or an unreasonable application of clearly established federal law, nor was it based on an

17  objectively unreasonable determination of the facts in light of the evidence presented at

18  trial.  28 U.S.C. § 2254(d)(1)&(2).  Accordingly, this claim for habeas corpus relief is

19  DENIED.

20      **C.    Comments Concerning Petitioner's Masculinity**

21      Petitioner asserts that the prosecutor committed misconduct by making "racist and

22  sexist argument, without any supporting evidence, that the motive for the crime was that

23  petitioner, a Mexican national, had an exaggerated sense of his masculinity and acted out

24  of "machismo.""  Pet. at 6.

25          **1.    Background**

26      In her opening statement, the prosecutor proffered the theory that petitioner "killed

27  the victim because he was faced with the slightest insult to his masculinity."  1 RT 87:5-7.

28  She reiterated this point twice more, and made the following statements: "That's all it took.

14

The slightest insult to his masculinity."  1 RT 89:13-14.  "But defendant's masculinity has

been insulted."  1 RT 90:1.

During her initial closing argument, the prosecutor reminded the jury that petitioner

had shot his unarmed victim twice in the chest and four times in the back.  She then stated:

"When faced with the slightest insult to his masculinity, he committed a senseless act of

violence."  4 RT 628:25-26.  She emphasized this point later, describing how Uribe's insult

had precipitated petitioner's shooting him.  She stated: "Tito [Uribe], he said, 'What's your

problem motherfucker?'  Slightest insult to his masculinity.  What does he do?  He walks

over to his car and gets his gun."  4 RT 634:25-27.

In her final closing argument, the prosecutor made no reference to petitioner's

masculinity, but argued that when "he was faced with the slightest insult" he deliberately

chose to murder Uribe.  4 RT 690:11-14.

## 2.    The State Court's Ruling

The Court of Appeal rejected petitioner's claim, ruling as follows:

Verduzco also charges the prosecutor with misconduct for her
argument that Uribe "was shot because of the slightest insult to the
defendant's masculinity, because of the slightest verbal insult."  He says this
argument attempted to sway the passion and prejudice of the jury by "a veiled
sexist and racist argument."  After review of the record, we think nothing of
the kind took place.  Verduzco acknowledges that the prosecutor did not refer
to his race or argue that he had any cultural or ethnic propensity to commit
murder. (*Cf. People v. Hakam* (1929) 99 Cal. App. 147, 152 [in case involving
Afghani defendant, prosecutor argued "'[i]t was that hot seething blood, which
was incubated in some other country, which has not cooled by association
with the calmer peoples of the Western World, that was in his mind at the time
that he went out and he had this talk with this boy'"]; *People v. Criscione*
(1981) 125 Cal. App.3d 275, 286-289 [in case where defendant was charged
with the murder of his girlfriend, prosecutor referred repeatedly to his personal
opinion that Italians treated women badly, and argued defendant "was not
suffering from any mental disease, but merely acting out a common Southern
Italian masculine role"].)

It would be entirely speculative to construe the prosecutor's argument
as an appeal to a perceived "prejudice . . .  that Hispanic men are obsessed
with their masculine image - their 'machismo' - and are prone to fly off the
handle whenever it is challenged."  Instead, the prosecutor's comment simply
suggested Verduzco killed Uribe for the trivial reason that Uribe used an
especially offensive epithet.  Indeed, Verduzco acknowledges he was insulted
when Uribe "essentially told him to shut up and called him a 'motherfucker.'"
There was no appeal, as Verduzco contends, by the prosecutor for the jury to
"decide [Verduzco's] guilt or innocence based on generalizations about

national character" rather than the law and evidence presented during trial. There is no reasonable likelihood the jury construed any of these remarks in the objectionable fashion suggested by Verduzco. (*See People v. Ayala* (2000) 23 Cal.4th 225, 283-284.)

Ex. 6 at 14-15.

### 3.    Analysis

The Constitution prohibits racially biased prosecutorial arguments. *McClesky v. Kemp*, 481 U.S. 279, 309 n.30 (1987).  Petitioner, however, has presented no evidence that supports the conclusion that the term "masculinity" is understood to have any racial or ethnic connotations.  In particular, in this case the record shows that the prosecutor's reference to masculinity was based on evidence that petitioner shot Uribe because Uribe had challenged his authority by calling him a motherfucker and insulting his mother.

Further, even assuming the prosecutor's remarks were improper, petitioner has not demonstrated that the remarks had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  Instead, the evidence shows that after Uribe insulted petitioner, petitioner retrieved his gun and walked toward Uribe, firing at him from a point blank range.  Petitioner shot Uribe twice in the chest and then four times in the back as Uribe was running away.  In view of this strong evidence against petitioner, this court finds that the prosecutor's characterization of Uribe's insults as being an affront to petitioner's masculinity did not have a substantial effect on the verdict.

Based on the above, this court finds the state court's determination was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an objectively unreasonable determination of the facts in light of the evidence presented at trial.  28 U.S.C. § 2254(d)(1)&(2).  Accordingly, this claim for habeas corpus relief is DENIED.

## II.    Instructional Error

Petitioner claims three instances of instructional error.

//

//

16

**A.     Standard**

Federal habeas relief is available when a jury instruction so infects the trial that it is rendered fundamentally unfair, in violation of due process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  An examination of the trial record is required to see precisely what instructions were given and refused, and to determine whether the given instructions adequately embodied the defendant's theory of defense or whether they were so prejudicial as to infect the entire trial and so deny due process. *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979).

**B.     Failure to Instruct on Voluntary Manslaughter**

**1.     Background**

At the close of evidence, petitioner requested an instruction on heat of passion voluntary manslaughter, arguing that the evidence demonstrated that Uribe had precipitated an argument and had taken a "fighting stance."  4 RT 621.  Petitioner claimed that under those circumstances, "a reasonable jury could find that this was a sudden quarrel or threat," and that there was no "malice."  4 RT 621.  The trial court declined to give such an instruction, stating:

> [T]he best summary of events just before the shooting appears to be that the victim and defendant were arguing in a loud tone, . . . calling each other names.  The exact words exchanged between the victim and defendant are really unknown, except that the word 'motherfucker' was used. [¶]  There was no provocative conduct on the part of the victim, the part just before the shooting, unless you call words provocative conduct.  And the defendant appeared to be calm just before he started shooting [the victim].  [¶] Therefore, the court's ruling is that the defendant has not carried his burden or theory of voluntary manslaughter.  The court finds that objectively, the passion of an  ordinarily reasonable person would not have been aroused under these circumstances and subjectively, there is no evidence that the defendant killed under any kind of heat of passion.

4 RT 624:26-625:15.

**2.     The State Court's Ruling**

The California Court of Appeal affirmed the trial court's ruling, first noting  that voluntary manslaughter "has both a subjective and an objective requirement. The defendant must kill while actually in the heat of passion. That heat of passion, however, must be aroused by sufficient provocation judged objectively."  Ex. 6 at 18.  The court then

17

1    ruled as follows:

2           Verduzco argues the court was wrong because "the jury could have
     found that a reasonable person in [defendant's] position, faced with the
3    victim's angry statements that not only was he a motherfucker but also that
     there was something despicable about his mother, would have been
4    overcome by anger." But in *People v. Manriquez*, *supra*, 37 Cal.4th at page
     586, our Supreme Court ruled that evidence the victim "called defendant a
5    'mother fucker' and that he also taunted defendant . . . plainly [was]
     insufficient to cause an average person to become so inflamed as to lose
6    reason and judgment. [Citation.]   Accordingly, the evidence of provocation
     was insufficient to suggest that defendant's killing of [the victim] amounted to
7    voluntary manslaughter rather than murder."FN9 (*See also People v. Najera*
     (2006) 138 Cal. App.4th 212, 215 [being called a "faggot" was "insufficient to
8    cause an average person to lose reason and judgment under an objective
     standard"].)

9           FN9. Verduzco attempts to distinguish *Manriquez*, saying that Uribe's
10   "verbal behavior was more provocative and likely to cause [Verduzco] to
     become angry than merely calling him a motherfucker."  But the victim in
11   *Manriquez* went beyond the simple use of that epithet, and taunted the
     defendant, "repeatedly asserting that if defendant had a weapon, he should
12   take it out and use it." (*People v. Manriquez, supra*, 37 Cal.4th at p. 586.)

13          Verduzco's reliance on *People v. Valentine* (1946) 28 Cal.2d 121 is
     misplaced.  There the court concluded it was error to instruct the jury that
14   words alone could never provide sufficient provocation to reduce an offense
     from murder to manslaughter.  (*Id* . at pp. 137-144.)  No such erroneous
15   instruction was given here, and the court in fact recognized that verbal
     provocation might in a proper case be sufficient.  Verduzco has not shown the
16   court erred when it concluded this was not such a case.

17   Ex. 6 at 19-20 (footnote omitted).

18              **3.    Analysis**

19         The failure to instruct on a lesser-included offense in a capital case is constitutional

20   error if there was evidence to support the instruction.  *See Beck v. Alabama*, 447 U.S. 625,

21   638 (1980).  The failure of a state trial court to instruct on a lesser-included offense in a non-

22   capital case, however, does not present a federal constitutional claim.  *See Solis v. Garcia*,

23   219 F.3d 922, 929 (9th Cir. 2000); *see also  Keeble v. United States*, 412 U.S. 205, 213

24   (1973) ("[W]e have never explicitly held that the Due Process Clause of the Fifth

25   Amendment guarantees the right of a defendant to have the jury instructed on a lesser

26   included offense").  Because there is no clearly established Supreme Court authority

27   requiring such instruction, the state court's rejection of petitioner's claim cannot be contrary

28   to, or an unreasonable application of, clearly established federal law.  *Carey*, 549 U.S. at 77.

1

2       The Ninth Circuit holds that "the defendant's right to adequate jury instructions on his

3  or her theory of the case might, in some cases, constitute an exception to the general rule"

4  that instruction on a lesser-included offense is not constitutionally required.  *Solis*, 219 F.3d

5  at 929.  However, there must be substantial evidence to warrant the instruction on the

6  lesser-included offense.  *See id.* at 929-30 (finding no duty to instruct on voluntary

7  manslaughter as lesser-included offense to murder because evidence presented at trial

8  showed implied malice and precluded a heat of passion or imperfect self-defense

9  instruction).  In this case, the state court determined there was insufficient evidence of

10  provocation to warrant an instruction on the lesser-included offense of voluntary

11  manslaughter because Uribe's statements to petitioner were not sufficiently provocative and

12  there was no other conduct by Uribe before petitioner shot him.  That determination was not

13  objectively unreasonable.

14       Based on the above, this court finds the state court's determination was not contrary

15  to or an unreasonable application of clearly established federal law, nor was it based on an

16  objectively unreasonable determination of the facts in light of the evidence presented at trial.

17  28 U.S.C. § 2254(d)(1)&(2).  Accordingly, this claim for habeas corpus relief is DENIED.

18      **C.      Failure to Instruct that Provocation Could Reduce the Murder to Second
             Degree**

19              **1.      Factual Background**

20       The trial court instructed the jury on first and second degree murder.  The jury was

21  told that to convict petitioner of first degree murder, it was required to find his decision to kill

22  "must have been formed upon pre-existing reflection, and not under a sudden heat of

23  passion or other conditions precluding the idea of deliberation," while "[m]urder of the

24  second degree is the unlawful killing of a human being with malice aforethought when the

25  perpetrator intended unlawfully to kill a human being, but the evidence is insufficient to

26  prove deliberation and premeditation."  4 RT 709:9-12, 710:7-11.

27       Petitioner claims that the trial court erred by not *sua sponte* instructing the jury that

28  provocation could reduce the murder from first to second degree.

**United States District Court**
For the Northern District of California

## 2.    The State Court's Ruling

The California Court of Appeal rejected petitioner's challenge, finding as follows:

> Verduzco now argues that the instructions were misleading because the jury should also have been instructed that provocation leading a perpetrator to kill could reduce a murder from first degree to second.FN11 [Citation omitted.]
>
> FN11. CALCRIM No. 522, which defendant argues should have been given, states, in relevant part: "Provocation may reduce a murder from first degree to second degree. [¶] The weight and significance of the provocation, if any, are for you to decide.  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."
>
> In his reply brief, Verduzco acknowledges that an instruction the jury could consider whether a perpetrator was provoked is a "pinpoint" instruction that the court is not required to give *sua sponte*. (*People v. Rogers* (2006) 39 Cal.4th 826, 878-880.)  But here he says the court should have given a provocation instruction . . . .   We disagree [¶]  The instruction on first degree murder specifically invited the jury to consider whether Verduzco acted under a sudden heat of passion.  If the jury was to conclude that he did, the circumstances would negate his reflection and deliberation to commit first degree murder.  These instructions were not confusing or misleading and the jury was allowed to consider whether Verduzco acted in anger or passion.  But more importantly, there is no substantial evidence that would compel the court to specifically instruct on provocation just as there was no such evidence to warrant an instruction on voluntary manslaughter. [Citation omitted.]  It was Uribe, not Verduzco, who witnesses overwhelmingly described to be agitated and angry before the shooting, and Verduzco calmly retrieved a gun from his car and walked several steps toward Uribe when he fired multiple shots into his torso.

Ex. 6 at 20-21.

## 3.    Analysis

A claim of state instructional error can be the basis of federal habeas relief only if the error, considered in light of all the instructions given and the trial record, "so infected the entire trial that the resulting conviction violates due process."  *Estelle*, 502 U.S. at 72 (quotation and citation omitted).  Where the alleged error stems from the failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission or incomplete instruction is less likely to be prejudicial than a misstatement of the law."  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977); *Jeffries v. Blodgett*, 5 F.3d 1180, 1195 (9th Cir. 1993).  "Failure to give [a jury] instruction which might be proper as a matter of state law, by itself, does not merit federal habeas relief."  *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (quotation and citation omitted).

20

1    In this case, no instructional error occurred when the trial court failed to *sua sponte*

2    instruct the jury that provocation could reduce the murder from first to second degree

3    because, as found by the Court of Appeal, there was no substantial evidence petitioner was

4    acting under a sudden heat of passion.  Petitioner has made no showing that this

5    determination was objectively unreasonable.  Rather, the evidence petitioner relies upon to

6    support a provocation instruction shows, as the state court noted, that Uribe was angry, not

7    petitioner.  Ex. 6 at 22-24.

8    Further, even if there was instructional error, petitioner was not prejudiced thereby.

9    The jury was told explicitly to consider the instructions "as a whole and each in light of all the

10   others."  Ex. 1 at 145 (CALJIC No. 1.01).  Specifically, the jury was instructed that, in order

11   to find petitioner guilty of first degree murder, it must find that "the killing was preceded and

12   accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the

13   result of deliberation and premeditation, so that it must have been formed upon pre-existing

14   reflection and not under a sudden heat of passion or other condition precluding the idea of

15   deliberation[.]"  Ex. 1 at 176 (CALJIC No. 8.20).  Further, if the jury found sufficient evidence

16   of malice but insufficient evidence of deliberation and premeditation, it was instructed to find

17   petitioner guilty of second degree murder.  Ex. 1 at 178 (CALJIC No. 8.30).[3]  And, if the jury

18   had any doubt as to whether the killing was first or second degree murder, it was instructed

19   to find petitioner guilty of second degree murder Ex. 1 at 181 (CALJIC No. 8.71).[4]

20   Based on the above, this court finds the state court's determination was not contrary

21   to or an unreasonable application of clearly established federal law, nor was it based on an

22   objectively unreasonable determination of the facts in light of the evidence presented at trial.

23   28 U.S.C. § 2254(d)(1)&(2).  Accordingly, this claim for habeas corpus relief is DENIED.

24

25   [3]CALJIC No. 8.30 provides, "Murder of the second degree is the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation."

26

27   [4]CALJIC No. 8.71 provides, "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by the defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or second degree, you must give the defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree."

28

United States District Court
For the Northern District of California

**D.      Whether the Second Degree Murder Instruction Was Misleading**

**1.      Background**

As noted, the trial court instructed the jury on second degree murder with CALJIC No. 8.30, which provides as follows:

> Murder of the second degree is the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation.

4 RT 710:7-11.

Petitioner claims the instruction prejudicially misled jurors by diluting the prosecution's burden of proof because it suggested a higher degree of doubt than is required under the reasonable doubt standard.

**2.      The State Court's Ruling**

The Court of Appeal rejected this contention, finding as follows:

> Verduzco says the word "insufficient" as used in the instruction required the jury to find "the absence of any evidence on the basis of which a reasonable trier could find the fact to be true." Thus, in light of this instruction, it would not have been enough for the jury to have a reasonable doubt about Verduzco's deliberation or premeditation. Instead, Verduzco says the word "insufficient" should be replaced in the instruction with the phrase "there is a reasonable doubt as to whether." FN12 Verduzco says in this way the jury would properly consider whether the evidence proved deliberation and premeditation. In context, Verduzco's argument makes a distinction without a difference.

> FN12. The instruction would then read: a defendant could be guilty of second degree murder when the evidence shows the defendant "intended unlawfully to kill a human being, but there is a reasonable doubt as to whether the evidence proves deliberation and premeditation."

> The sufficiency of the instructions given to the jury must be considered as a whole, rather than viewing one instruction or parts of one in isolation. (*People v. Burgener* (1986) 41 Cal.3d 505, 538.) An omission from one instruction may be supplied by another or cured by the instructions as a whole. (*Id.* at pp. 538-539.)

> The totality of the instructions properly conveyed the applicable standard of proof to the jury.FN13  (*See People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 [jury instructions are to be considered as a whole]; *People v. Cain* (1995) 10 Cal.4th 1, 36 [defendant must establish a reasonable likelihood the jury misunderstood the instructions as a whole].)  The jury was instructed that to find Verduzco guilty of first degree murder, it would have to conclude he was guilty of a willful, deliberate and premeditated killing. There is no reasonable likelihood that the jury misconstrued or misapplied these terms in the fashion Verduzco suggests.  (*See People v. Brown* (2000) 7 Cal. App.

United States District Court
For the Northern District of California

4th1324, 1334-1335 [jury would not have been confused because the "proper reasonable doubt standard was emphasized many times in the instructions and arguments"]; *People v. Wade* (1995) 39 Cal. App.4th 1487, 1491-1492 [no reasonable likelihood jury misinterpreted presumption of innocence to undercut reasonable doubt standard].)

FN13. The jury was instructed that "[a] defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the people the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: [¶] It is not a mere possible doubt, because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." The jury was further instructed: "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by the defendant, but you unanimously agree that you have a reasonable doubt whether the murder is of the first or second degree, you must give the defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree." Defense counsel reiterated the reasonable doubt standard of proof many times during closing argument, and argued that the requisite deliberation and premeditation for first degree murder had not been proven under that standard.

Ex. 6 at 21-23.

### 3.    Analysis

When reviewing instructional error that is alleged to have reduced the prosecution's burden of proof, the Supreme Court has explained:

Analysis must focus initially on the specific language challenged, but the inquiry does not end there. If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense, the potentially offending words must be considered in the context of the charge as a whole. Other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption.

*Francis v. Franklin*, 471 U.S. 307, 315 (1985).

In this case, the California Court of Appeal applied precisely this standard when it determined that the jury would have interpreted the word "insufficient" in CALJIC No. 8.30 in light of CALJIC Nos. 2.90 and 8.71, and would have understood it to mean "not proven beyond a reasonable doubt." This determination was not objectively unreasonable. Because the state court's rejection of petitioner's claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent, this claim for

**United States District Court**

For the Northern District of California

1   habeas corpus relief is DENIED.  28 U.S.C. § 2254(d)(1).

2   **III.   Insufficient Evidence**

3        Petitioner contends there was insufficient evidence of premeditation and deliberation

4   to support the verdict of first degree murder.

5        **A.   Standard**

6        Evidence is constitutionally sufficient to support a conviction when, upon "viewing the

7   evidence in the light most favorable to the prosecution, any rational trier of fact could have

8   found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*,

9   443 U.S. 307, 319 (1979).  The relevant inquiry is not whether the evidence excludes every

10  hypothesis except guilt.  *Id.* at 326.

11       The *Jackson* standard "must be applied with explicit reference to the substantive

12  elements of the criminal offense as defined by state law."  *Id.* at 324 n.16.  The reviewing

13  court must presume that the trier of fact resolved any conflicts in the evidence in favor of the

14  prosecution and must defer to that resolution.  *Id.* at 326.  "A jury's credibility determinations

15  are therefore entitled to near-total deference under *Jackson*."  *Bruce v. Terhune*, 376 F.3d

16  950, 957 (9th Cir. 2004).  Under 28 U.S.C. § 2254(d)(1), the question is whether the state

17  court's application of the *Jackson* standard was objectively unreasonable.  *Juan H. v. Allen*,

18  408 F.3d 1262, 1274-1275 (9th Cir. 2005).

19       **B.   The State Court's Ruling**

20       The California Court of Appeal rejected petitioner's insufficiency of the evidence

21  claim, finding as follows:

22       Defendant contends there was insufficient evidence of premeditation
     and deliberation to support the verdict of first degree murder.  "'In reviewing
23   the sufficiency of the evidence, we must draw all inferences in support of the
     verdict that can reasonably be deduced and must uphold the judgment if, after
24   viewing all the evidence in the light most favorable to the prosecution, any
     rational trier of fact could have found the elements of the crime beyond a
25   reasonable doubt.'"  (*People v. Edwards* (1991) 54 Cal.3d 787, 813.)

26       Verduzco says there was no evidence that he gave careful thought to
     the killing, and rather, he acted on a mere unconsidered and rash impulse.  He
27   argues that when we examine the record, we will see there was no evidence of
     the type found sufficient to sustain a finding of premeditation and deliberation
28   in prior cases.  He says there was no evidence of planning, a prior relationship

United States District Court

For the Northern District of California

with the victim from which the jury could reasonably infer a motive, or facts about the nature of the killing that showed a "preconceived design." (*See People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)  But "[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate.  The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations.  It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Thomas* (1992) 2 Cal.4th489, 517.)

"In other words, the *Anderson* guidelines are descriptive, not normative. 'The *Anderson* factors, while helpful for purposes of review, are not a *sine qua non* to finding first degree premeditated murder, nor are they exclusive.'" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081.)  The California Supreme Court has also stated that *Anderson* does not provide "a definitive statement of the prerequisites for proving premeditation and deliberation in every case'" (*People v. Welch* (1999) 20Cal.4th 701, 758), nor is evidence of all three elements essential to sustain a conviction. (*People v. Edwards*, *supra*, 54 Cal.3d at p. 813.)  Further, the prosecution is not required to prove "a specific motive." (*People v. Thomas*, *supra*, 2 Cal.4th at p.519; *Edwards*, supra, at p. 814.)

Deliberation may take place with "great rapidity," and the defendant's action need not be "'planned for any great period of time in advance.'" (*People v. Vorise* (1999) 72 Cal. App.4th 312, 318.)  The manner of killing alone may support a conclusion that the murder was premeditated and deliberate. (*Ibid.*, quoting *People v. Memro* (1995) 11Cal.4th 786, 863-864.)  Here, Verduzco decided to kill Uribe after Uribe insulted him.FN15   Verduzco retrieved a loaded gun from his car, walked toward Uribe and fired multiple times into his unarmed victim.  This evidence was sufficient to allow the jury to conclude Verduzco acted with premeditation and deliberation. (*See People v. Silva* (2001) 25 Cal.4th 345, 369 [multiple shotgun wounds inflicted on unarmed victim were "entirely consistent with a premeditated and deliberate murder"]; *Vorise*, *supra*, at p. 319 [calm and repeated firing of gun into chest of incapacitated victim supported finding defendant "made a cold, calculated decision to kill the victim"].) FN16

FN15. Gomez also told police that Verduzco and Uribe had argued in the past.

FN16. In support of this final argument, Verduzco also chides the prosecutor for equating deliberation and premeditation with "rational thought," and their absence with "instinctive reaction," when she argued to the jury.  But jurors were correctly instructed on deliberation and premeditation, and we have no reason to conclude they misunderstood or incorrectly applied their charge.

Ex. 6 at 24-25.

## C.    Analysis

The record in this case shows that the circumstances and nature of the killing sufficed to establish premeditation and deliberation as defined by California law. Specifically, the

1   record shows that petitioner had a motive to kill Uribe because Uribe insulted him and his

2   mother, he retrieved a loaded gun from his car and walked toward Uribe, firing at him from a

3   point blank range, and, he shot Uribe twice in the chest and four more times in the back as

4   Uribe fled.  In view of such evidence, the jury reasonably could have found that petitioner

5   had ample time to premeditate his decision to kill Uribe and deliberate the nature of his

6   actions as he walked to his car to retrieve his gun and walked back to Uribe and started

7   firing.  *See People v. Bolin*, 18 Cal.4th 297, 332 (1998) (holding that defendant's act of

8   retrieving gun after arguing with victim supported finding that murder was premeditated).

9   Further, as discussed by the Court of Appeal, the jury also reasonably could have found

10   premeditation and deliberation based on petitioner's act of firing six bullets into an unarmed

11   victim.

12           The state court's rejection of petitioner's claim was not based on an objectively

13   unreasonable application of the *Jackson* standard.  Accordingly, this claim for habeas

14   corpus relief is DENIED.

15   **IV.  Ineffective Assistance of Counsel**

16           Petitioner alleges several instances of ineffective assistance of trial counsel.

17           **A.      Standard**

18           A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

19   Sixth Amendment right to counsel, which guarantees not only assistance, but effective

20   assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark

21   for judging any claim of ineffectiveness must be whether counsel's conduct so undermined

22   the proper functioning of the adversarial process that the trial cannot be relied upon as

23   having produced a just result.  *Id.*

24           In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a

25   petitioner must establish two things.  First, he must establish that counsel's performance

26   was deficient, i.e., that it fell below an "objective standard of reasonableness" under

27   prevailing professional norms.  *Id.* at 687–88.  Second, he must establish that he was

28   prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability

**United States District Court**

For the Northern District of California

**United States District Court**
For the Northern District of California

1 that, but for counsel's unprofessional errors, the result of the proceeding would have been
2 different." *Id.* at 694.  "The likelihood of a different result must be substantial, not just
3 conceivable." *Harrington v. Richter,* 131 S. Ct. 770, 792 (2011).

4      The *Strickland* framework for analyzing ineffective assistance of counsel claims is
5 "clearly established Federal law, as determined by the Supreme Court of the United States"
6 under 28 U.S.C. § 2254(d).  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011).  A "doubly"
7 deferential review of such claims is appropriate: "[T]he question is not whether counsel's
8 actions were reasonable. The question is whether there is any reasonable argument that
9 counsel satisfied *Strickland' s* deferential standard."  *Harrington,* 131 S. Ct. at 788.

10     **B.**    **Failure to Move to Sever Charges**

11         **1.**    **Background**

12      Petitioner contends his counsel rendered constitutionally ineffective assistance by
13 failing to move the court to sever from the murder charge the charges of possession of
14 methamphetamine for sale and felon in possession of a firearm, with the backup strategy of
15 advising petitioner to plead guilty to those charges if severance was denied.

16         **2.**    **The State Court's Ruling**

17     The Court of Appeal rejected this argument, finding as follows:

18          In the context of this case these claims are tailwagging the dog kind of
arguments.  The evidence through multiple witnesses showed that Verduzco
19         shot and killed Uribe in cold blood outside a place where certain participants in
the trial went to smoke methamphetamine.  Verduzco admits the evidence that
20         he shot Uribe six times with a semi-automatic handgun was "not hotly
contested at trial."  "The burden is on the party seeking severance to clearly
21         establish that there is a substantial danger of prejudice requiring that the
charges be separately tried." (*People v. Bean* (1988) 46 Cal.3d 919, 938,
22         italics added.)

23          The record does not support Verduzco's claims that the
methamphetamine charge and his status as a convicted felon had a
24         "devastating impact . . . on the jury."  The prosecution never argued that
Verduzco's methamphetamine possession had any connection to his murder
25         of Uribe.  (*Cf. People v. Cardenas* (1982) 31 Cal.3d 897, 907 [evidence of
defendant's heroin addiction could not be used to demonstrate his motive for
26         attempted robbery].)  Verduzco's argument that the methamphetamine for sale
charge allowed the jury to infer that he was a drug dealer who was prepared to
27         shoot people is also unsupported by the record.  The jury rejected the
possession for sale charge and convicted Verduzco of simple possession.
28         Rejection of possession for sale indicates the jury had the ability to carefully

United States District Court
For the Northern District of California

1  evaluate the evidence and that it was not swayed by improper considerations.
2  There is no reasonable probability that the outcome of the murder charge
   would have been more favorable to Verduzco if his lawyer had moved to sever
   the methamphetamine and firearm charges.  (*See Strickland V. Washington*
3  (1984) 466 U.S.668, 693-694; *People v. Ledesma* (1987) 43 Cal.3d 171,
   217-218.)

4

5         It is also highly unlikely the court would have severed the felon in
   possession of a firearm charge from the murder even had Verduzco's counsel
6  made such a motion.  Both events were part of the same transaction. (*See*
   Pen. Code, § 954 ["An accusatory pleading may charge two or more different
7  offenses connected together in their commission . . . ."].)  There also appears
   to be a tactical reason why Verduzco's counsel may have stipulated to his
8  status as a felon.  His prior felony was possession of a controlled substance.
   Due to his stipulation, the jury was instructed it could not speculate about the
9  nature of Verduzco's prior conviction.  So, by stipulating that Verduzco was a
   convicted felon, defense counsel minimized the spillover effect Verduzco's
10 prior felony may have had on the methamphetamine possession charge.  "'In
   the usual case, where counsel's trial tactics or strategic reasons for challenged
11 decisions do not appear on the record, we will not find ineffective assistance of
   counsel on appeal unless there could be no conceivable reason for counsel's
   acts or omissions.'" (*People v. Jones, supra*, 29 Cal.4th at p.1254.)
12

13        Finally, we will not speculate on whether counsel should have advised
   Verduzco to plead guilty to the methamphetamine and firearm counts to avoid
14 any spillover effect on the murder charge.  It appears on this record that
   spillover, if any, was minimal.

15 Ex. 6 at 16-17.

16             **3.    Analysis**

17    A joinder, or denial of severance, of co-defendants or counts may prejudice a

18 defendant sufficiently to render his trial fundamentally unfair in violation of due process.

19 *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997); *Herd v. Kincheloe*, 800 F.2d 1526,

20 1529 (9th Cir. 1986).  A federal court reviewing a state conviction under 28 U.S.C. § 2254

21 does not concern itself with state law governing severance or joinder in state trials; its

22 inquiry is limited to the petitioner's right to a fair trial under the United States Constitution.

23 *Grisby*, 130 F.3d at 370.  To prevail, therefore, the petitioner must demonstrate that the

24 state court's joinder or denial of his severance motion resulted in prejudice great enough to

25 render his trial fundamentally unfair.  *Id.*  In addition, the impermissible joinder must have

26 had a substantial and injurious effect or influence in determining the jury's verdict.  *Sandoval*

27 *v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).  Joinder generally does not result in

28 prejudice if the evidence of each crime is simple and distinct and the jury is properly

United States District Court
For the Northern District of California

1  instructed so that it may compartmentalize the evidence.  *Bean v. Calderon*, 163 F.3d 1073,
2  1085-86 (9th Cir. 1998); *see Sandoval*, 241 F.3d at 773 (given the strength of the State's
3  case against petitioner on both sets of murders and the cross-admissibility of the evidence
4  on each set, petitioner's trial was not actually prejudiced by the joinder).  Additionally, joinder
5  generally does not result in prejudice if the jury did not convict on all counts, because it
6  presumably was able to compartmentalize the evidence.  *Park v. California*, 202 F.3d 1146,
7  1149-50 (9th Cir. 2000).

8  In this case, the state court did not unreasonably apply *Strickland* in concluding that
9  petitioner was not prejudiced by counsel's failure to move to sever the drug sales and
10  firearm possession charges and, if the motion was denied, to advise him to plead guilty to
11  those charges.[5]  The state court reasonably determined that  the drug charge was
12  insignificant in comparison to the murder charge, the evidence on the latter was strong, and
13  the prosecutor never drew a connection between the two.  Petitioner's theory about the
14  inflammatory effect of this evidence is weakened by the fact that the jury did not convict him
15  of possession for sale, but of the lesser offense of simple possession.  Similarly, his theory
16  about the inflammatory effect of evidence that he possessed a firearm is weak because, as
17  petitioner acknowledged below, "the evidence that he shot Uribe six times with a
18  semi-automatic handgun was 'not hotly contested at trial.'"  Ex. 6 at 16.  Moreover, this
19  evidence would have been admitted even if he had plead guilty to that charge because he
20  used the firearm to commit the murder.  There also is no reasonable probability the result of
21  the proceeding would have differed had the jury not learned he had suffered a prior felony
22  conviction, the nature of which they were instructed not to speculate about.  Ex. 6 at 17.
23  The evidence that petitioner shot and killed Uribe without provocation was strong.

24  Based on the above, this court finds that the state court's rejection of petitioner's
25  *Strickland* claim based on counsel's failure to move to sever or advise petitioner to plead

26
27
28
[5]The record sheds no light on whether counsel actually advised petitioner to plead
guilty to the methamphetamine and firearm possession charges.  It does, however, reflect
that petitioner stated that he did not want a settlement and instead wanted a jury trial.  1 RT
10:19-22.

1 | guilty to the firearm count to avoid any spillover effect on the murder charge was not
2 | objectively unreasonable.  Accordingly, this claim for habeas relief is DENIED.

3 |           **C.     Prosecutorial Misconduct Claims**

4 |           Petitioner claims counsel was ineffective for failing to object to the prosecutor's
5 | elicitation of testimony from witnesses and related arguments, discussed above at Section I
6 | of this order.  The Court of Appeal rejected this argument, finding that there was no valid
7 | basis to object because the prosecutor committed no misconduct.  Ex. 6 at 16.

8 |           A lawyer need not file a motion that he knows to be meritless on the facts and the
9 | law.  Put simply, trial counsel cannot have been ineffective for failing to raise a meritless
10 | motion.  *Juan H.*, 408 F.3d at 1273.  Instead, the question under the deficient performance
11 | prong of *Strickland* is whether reasonable counsel might have declined to make a motion
12 | under the circumstances or, put another way, whether failure to make a motion might be
13 | considered sound trial strategy.  In order to establish prejudice under the second prong of
14 | *Strickland* from failure to file a motion, petitioner must show that (1) had his counsel filed the
15 | motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had
16 | the motion been granted, it is reasonable that there would have been an outcome more
17 | favorable to him.  *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999).

18 |           In this case, the California Court of Appeal's determination that an objection to the
19 | prosecutor's argument would have been meritless was not objectively unreasonable
20 | because, as discussed above, there was no prejudicial prosecutorial misconduct.
21 | Consequently, the state court's rejection of petitioner's ineffective assistance of counsel
22 | claim was not contrary to or an unreasonable application of *Strickland.*  Accordingly, this
23 | claim for habeas corpus relief is DENIED.

24 |

25 |           **D.     Instructional Error Claim**

26 |           Petitioner claims counsel was ineffective for failing to request an instruction on
27 | provocation, as discussed above at Section II(C) of this order.

28 |           The California Court of Appeal rejected this claim, finding as follows:

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> In order to show that his counsel was ineffective for not seeking an instruction on provocation, Verduzco must show that his lawyer's performance was both deficient and prejudicial. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1014-1015.) We need not consider whether Verduzco's lawyer was deficient in failing to request the provocation instruction, because we conclude on this record that the provocation instruction was unnecessary.

Ex. 6 at 20.

A trial attorney has wide discretion in making tactical decisions, including foregoing jury instructions inconsistent with trial theory. *See Butcher v. Marquez*, 758 F.2d 373, 377 (9th Cir. 1985). This court has already found that, in this case, the California Court of Appeal reasonably determined that there was not substantial evidence to support an instruction on provocation. Consequently, counsel was not ineffective for failing to request such an instruction.

Because the state court's determination was not contrary to or an unreasonable application of *Strickland*, this claim for habeas corpus relief is DENIED.

**V.    Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability (COA) in the ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a COA. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This requires an overview of the claims in the habeas petition and a general assessment of their merits. It does not require full consideration of the factual or legal bases adduced in support of the claims. *Miller-El v. Cockrell*, 537 U. S. 322, 336 (2003). The question is the debatability of the underlying constitutional claim, not

31

the resolution of that debate.  *Id.* at 342.

Here, jurists of reason would not find debatable or wrong this court's assessment that the state courts' rejection of petitioner's claims was not objectively unreasonable. Accordingly, a COA will be denied.  Petitioner may not appeal the denial of a COA, but may ask the court of appeals to issue a COA under Rule 22 of the Federal Rules of Appellate Procedure.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.  A certificate of appealability is **DENIED**.  The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: February 11, 2013

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.09\VERDUZCO5894.HC.DENY.ECK

**United States District Court**
For the Northern District of California